(C.D. 2248)

THE A. W. FENTON CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 10, 1961)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*William H. Orrick, Jr.,* Assistant Attorney General (*Henry J. O'Neill,* trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation, described on the consular invoice as "200 pieces Type 7K21" finished hardened steel balls, was classified by the collector of customs as "Parts of articles suitable for controlling speed of arbors, drums, etc.," and it is conceded by plaintiff, in its brief, that the articles "were designed for use, and are used, as essential parts of articles suitable for controlling the speed of arbors, drums, etc." Duty was imposed on the articles at the rate of 45 per centum ad valorem as provided in paragraph 368 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 368), as modified by the trade agreement with Switzerland, 90 Treas. Dec. 174, T.D. 53832.

Plaintiff, by its protest, and an amendment thereof, makes alternate claims for lower rates of duty than the rate assessed, but, in its brief filed herein, limits its claim to classification of the merchandise in paragraph 321 of said act (19 U.S.C. § 1001, par. 321), as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T.D. 52462, as "Antifriction balls * * *, whether finished or unfinished, for whatever use intended," which are subject to duty at the rate of 4 cents per pound, plus 12½ per centum ad valorem.

At the trial, it was stipulated and agreed between the parties that the merchandise in controversy is composed wholly or in chief value of steel.

Plaintiff introduced illustrative exhibit 1, which is a model of a speed variator, with a cutaway section disclosing the interior of the variator with the so-called finished hardened steel balls therein being of a smaller size than those actually imported. Defendant introduced exhibits A and B, consisting of promotional material in the form of pamphlets distributed to the trade by the Cleveland Worm & Gear Co., Ltd., the actual importer.

Plaintiff called as its witness George H. Acker, president of the Cleveland Worm & Gear Co., Ltd. A witness called by the Government was unable to give probative evidence due to sustained objections to his qualifications.

The gist of Acker's testimony is that he had been with the importing company since 1923 in the capacity of engineer, chief engineer, vice president in charge of production, executive vice president, and, finally, president. He had received a mechanical engineering degree from Cornell University; had specialized in the power transmission field, which involved detailed study of frictional matters; and had—

\* \* \* propounded the theory and developed the rating practices for worm gear rating for the American Gear Manufacturer's Association.

The witness was familiar with the nature, function, and uses of the articles in controversy, which he stated were designed according to specifications supplied by his company for a specific use. The sphericity is accurately controlled; they are treated to a high degree of hardness: they are closely matched in size and supplied in matched sets. The balls are aged in the process of manufacture to achieve size stability and have an accurately finished bore extending through their diameter.

The balls are used in a device known as a speed variator, represented by illustrative exhibit 1—

\* \* \* which has the function of infinitely regulating speed from a constant speed input source over a range of approximately nine to one.

The appearance and function of the balls and an examination of the three exhibits will make clear the statement of the witness that "The rotation of the shaft causes rotation of the raceway mounted thereon, which in turn causes all four of the balls in the device to rotate correspondingly. Those balls in turn drive or cause the raceway on the output shaft to rotate and the shaft to rotate with it." The purpose of the balls is to transmit power and permit speed regulation or speed adjustment. They have a low coefficient of friction which is essential to give a high rate of efficiency. When the witness was asked if these balls have the characteristic of reducing friction when in use, he replied "That is why they are employed." When asked if the balls operate in a raceway similar to that of other types of antifrictional balls, Acker stated:

The outer raceway is in very close conformance with outer raceways employed in certain other types of bearings. The inner raceways are peculiar in that they are true conical surfaces. They do not necessarily have to be such. They could be given a concave facing that would make them conform very closely with other conventional bearings. But from the standpoint of low operating friction loss, this conical surface that we employ yields a better result.

The fact that the balls have true sphericity, a high degree of hardness, and were evenly matched contributes much to the effectiveness of the balls for antifrictional purposes.

Plaintiff, in its brief, states that he has been unable to find any lexicographical definition of the expression "antifriction balls" but cites the following definition of the word antifriction, appearing in the Funk & Wagnalls New Standard Dictionary, 1942 edition:

anti-friction—Lessening or tending to lessen friction, as by lubricants or rollers.

Webster's New World Dictionary, college edition (1958), contains the following definition:

antifriction, *adj.* reducing friction. *n.* a device, lubricant, etc. for reducing friction.

Based upon the definition cited from Funk & Wagnalls dictionary, *supra*, plaintiff concludes that "antifriction balls" can, therefore, "be defined as balls which lessen or tend to lessen friction, and the balls under protest are designed to do, and are actually used to do, that very thing." As a matter of fact, the word "antifriction" would seem in terms to define itself, and we are of the opinion, based upon the testimonial record and the exhibits, that the balls in controversy are, in fact, antifriction balls.

The Government, in its brief, invites our attention to a definition of "antifriction balls and bearings" in the Dictionary of Tariff Information (1924), page 35, which reads:

ANTIFRICTION BALLS AND BEARINGS.

Antifriction bearings consist of metal balls or rollers fitted between two metal cases in such a way that a shaft may be inserted into the inner case, and the outer case into the bearing frame, the contact between the two cases being through balls or rollers. This arrangement substitutes a rolling contact for the sliding contact of the ordinary bearing and thus reduces friction.

The automobile industry is the largest consumer of ball and roller bearings; the bicycle affords examples of the use of the former variety. Some antifriction bearings are used in screw-jacks, many machine tools, elevators, etc.

The Government then argues that:

The involved articles in shape and use are not antifriction balls. Clearly, they are not fitted between two metal cases in such a way that a shaft may be inserted into the inner case. A visual examination of Exhibit 1, reveals that the involved articles are mounted on an axle inserted therein by way of their bored centers; that they are not loose, but instead are actually situated in a fixed position.

We do not regard the definition cited by the Government as all inclusive of what may be embraced in the term "antifriction balls," and the fact that the subject balls are or are not "fitted between two metal cases," as mentioned in the Dictionary of Tariff Information, does not serve to exclude the balls in controversy from classification as "antifriction balls."

Having arrived at the conclusion that the subject balls are anti-friction balls within the meaning of paragraph 321, *supra*, and it having been conceded by plaintiff that they are within the descriptive language of paragraph 368, *supra*, as parts of articles suitable for controlling speed of arbors, drums, et cetera, we are of the opinion that the language of paragraph 321, with which we are here concerned, must be deemed more specific than the provision in paragraph 368, by reason of the very definite and positive language in paragraph 321 providing for antifriction balls "* * * for whatever use intended."

The provision in paragraph 368 is a "use" provision. The expression "antifriction balls" in paragraph 321 clearly implies use. However, Congress has plainly indicated that the provision in paragraph 321 was designed to embrace "antifriction balls" regardless of their intended use.

Plaintiff, in its brief, cites the case of *J. F. Goldkamp & Co.* v. *United States*, 39 Cust. Ct. 420, Abstract 61194, wherein certain steel balls, 1 millimeter in diameter, had been classified in the provision for—

Fountain pens, fountain-pen holders, stylographic pens, and parts thereof * * *,

on the ground that they were parts for fountain pens. In the course of its opinion in that case, the court referred to an argument of defendant that "It is common knowledge that the main purpose of 'anti-friction balls' is to reduce friction in bearings," which the court answered by saying, "Even assuming such fact to be true, it is observed that the tariff provision in paragraph 321, *supra*, does not limit the antifriction balls there provided for to use in bearings, but embraces such balls 'for whatever use intended.'" The court further observed, "* * * but we think the inclusion of the sweeping term 'for whatever use intended' demonstrates a legislative intent not to limit the scope of the term to balls used in ball bearings. Unless this were the intent, there would be no purpose in the inclusion of the words 'for whatever use intended.'" The court, accordingly, held that the steel balls in that case should properly be classified in paragraph 321.

A case not cited by the parties, which has a bearing here, is *United States* v. *J. A. Freeman & Son*, 29 C.C.P.A. (Customs) 103, C.A.D. 177. The court was there concerned with the classification of a variety of articles, including certain steel balls for use as parts of

agricultural implements. It appears from the opinion of the court that the steel balls were imported for use on Deering mowers, "* * * that they would 'reduce friction'; that they could be used 'Any place on an agricultural implement where you needed a ⅝″ ball'; and, on cross-examination, that any ⅝″ steel ball could be used on the Deering mower." Since the provision for agricultural implements contained a proviso "That no article specified by name in Title I shall be free of duty under this paragraph [1604 of the Tariff Act of 1930]," the court was of the opinion that "* * * these steel balls, particularly since they are used to 'reduce friction,' are specified by name in paragraph 321, *supra*, as 'Antifriction balls * * * for whatever use intended,' and are properly dutiable thereunder."

For the reasons stated, the claim of the importer that the merchandise in controversy should be classified in paragraph 321, *supra*, is sustained. All other claims are overruled.

Judgment will issue accordingly.